IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:12CV35 |
| vs. | |
| $38,000.00 IN UNITED STATES CURRENCY, | MEMORANDUM AND ORDER |
| Defendant. | |

      This matter is before the court on the plaintiff United States of America's complaint for forfeiture of $38,000 in United States Currency (the "Currency"). (Filing No. 1). Claimant Richard A. McKee filed an answer seeking dismissal of the case, asserting the United States cannot demonstrate the Currency was used or was intended to be used to facilitate a drug transaction. (Filing Nos. 9 & 10). A bench trial was held before the undersigned on January 7, 2013, and the parties have now submitted post-trial briefs in support of their respective positions. For the reasons set forth below, the Currency shall be forfeited to the government.

BACKGROUND

      On August 25, 2011, Douglas County Sheriff's Deputy Dave Wintle, accompanied by his drug detector dog, Kubo, was driving a marked police cruiser westbound on Interstate 80 in Douglas County, Nebraska. Wintle has received education and training in criminal interdiction from various sources, including Desert Snow, and he uses criminal interdiction tactics as a part of his duties when conducting traffic stops.

      Wintle observed the Claimant, Richard McKee, traveling westbound on Interstate 80 in a white Honda with Oregon license plates. Wintle saw McKee following the car in front of him at a distance of approximately one car length. Wintle initiated a traffic stop.

Wintle approached the car on the passenger's side and asked McKee for his license and registration. While talking to McKee, Wintle noticed an Indiana temporary registration certificate on the floor of the passenger's side of the car and a black duffel bag on the front passenger seat. Wintle instructed McKee to accompany him back to the police cruiser. McKee sat unrestrained in the front passenger side of Wintle's car while Wintle checked his license and registration. McKee told Wintle that the car belonged to a friend of his.

While waiting for the information on McKee's license and the car's registration, Wintle engaged in casual conversation with McKee regarding the nature of his travel and his work. McKee stated that he and a friend who owned the car drove from Oregon to Ohio and that McKee was now on the return trip. He further stated that his friend was on a different schedule and flew back to Oregon earlier in the week. His friend apparently purchased the car in Oregon, but was registering the vehicle in Indiana. When asked about his employment, McKee stated that he was working a temporary construction job, but was finishing up classes to become a math professor "in about a month."

While they were talking, McKee stated he knew he was probably following the car in front of him too closely, but he wondered if Wintle could let him go with a warning and not issue a ticket. McKee stated he had little money and was broke. Wintle informed McKee that he was going to give him a warning, but advised him to watch his following distance in the future.

Wintle gave McKee his license and registration back and asked McKee if he would mind answering a few questions. McKee agreed to do so. Wintle again asked McKee about his travel itinerary and McKee provided him answers consistent with their previous conversation on the topic. Wintle asked McKee if he had any items of

contraband in the car, such as marijuana, cocaine, methamphetamine, or heroin. McKee denied having these items. Wintle then asked McKee if there was a large sum of money – anything over $10,000 – in the car. McKee denied having a large amount of currency.

Wintle then asked if he could walk his canine, Kubo, around the car. McKee consented. Kubo indicated to the odor of narcotics in the trunk of the car. Wintle returned to his patrol car. McKee stated that he had put his clothes in the truck so they would not "stink up" the rest of the car. At that time, Wintle informed McKee of Kubo's indication and that Wintle would be searching the car for illegal contraband. Wintle was joined by another officer and they began searching the car. They discovered a garment bag in the trunk with three plastic grocery sacks containing clothes. Wintle described the bags as smelling strongly of raw marijuana. The law enforcement officers also searched the suitcase in the front passenger seat. Inside the suitcase they discovered a pair of rolled-up sweatpants containing a white paper sack. Inside the white paper sack, the officers found three rubber-banded bundles of money.

About an hour after the currency was found in McKee's suitcase, Wintle had Kubo conduct a canine sniff of the bundled money. Wintle walked Kubo around a room of lockers at the Sheriff's office. The dog did not alert or indicate to the odor of controlled substances coming from anywhere in the room. He and his dog stepped out of the room, then another officer hid the Currency in one of the lockers in the room. Deputy Wintle returned to the room with Kubo and directed Kubo to sniff for the odor of narcotics. Kubo indicated to the locker where the currency was hidden. Law enforcement officials seized the Currency.

LEGAL ANALYSIS

McKee challenges the seizure of the Currency, asserting: 1) the traffic stop was not supported by probable cause; 2) he was illegally detained following the conclusion of the traffic stop; and 3) the Currency is not sufficiently associated with criminal activity to warrant forfeiture.

A.   The traffic stop.

"It is well established that any traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." United States v. Washington, 455 F.3d 824, 826 (8th Cir. 2006). "To determine whether a traffic stop was based on probable cause or was merely pretextual, an 'objective reasonableness' standard is applied." United States v. Mallari, 334 F.3d 765, 766 (8th Cir. 2003). That is, "[a]n officer is justified in stopping a motorist when the officer 'objectively has a reasonable basis for believing that the driver has breached a traffic law.' " Id. at 766-67 (quoting Untied States v. Thomas, 93 F.3d 479-485 (8th Cir. 1996)). Where an officer's "understanding of the law is simply unreasonable . . . the officer's belief that there is a traffic violation would not be sufficient to establish probable cause to stop the vehicle." Id. at 913 n. 3. "The determination of whether probable cause existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." United States v. Sanchez, 572 F.3d 475, 478 (8th Cir. 2009) (quoting United States v. Sanders, 196 F.3d 910, 913 (8th Cir. 1999)). Law enforcement officers are not required "to interpret the traffic laws with the subtlety and expertise of a criminal defense attorney." Sanders, 196 F.3d at 913.

Wintle initiated the traffic stop of McKee for violating Neb. Rev. Stat. § 60-6140(1) which states:

> The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, and such driver shall have due regard for the speed of such vehicles and the traffic upon and the condition of the roadway.

Neb. Rev. Stat. § 60-6140(1). An officer's observation that a vehicle is following another too closely provides sufficient probable cause to initiate a stop for violating § 60-6140(1). United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998); see also Nebraska v. Draganescu, 276 Neb. 448, 460, 755 N.W.2d 57, 74 (2008)(troopers' observations that a vehicle was following too close provided sufficient probable cause for a stop).

After considering the testimony of Wintle and reviewing the video recording of the traffic stop from Wintle's in-car camera, the court finds there was probable cause to believe McKee was following too closely. Wintle testified he observed McKee traveling approximately 60 miles per hour at a following distance of one car length which is too close. A review of the video confirms this observation. Wintle is a trained and experienced law enforcement officer, and his observations provided a sufficient basis for concluding McKee was violating the statute in question. Accordingly, Wintle had probable cause to initiate the traffic stop.

  B. The continued encounter between Wintle and McKee.

Although not briefed, McKee's Answer (Filing No. 10) asserts that McKee was improperly detained after he received his warning for the traffic violation. During a routine traffic stop, an officer is entitled to detain the driver while the officer completes tasks such as asking for the driver's license and vehicle registration, and inquiring about the vehicle occupant's destination, route and purpose. United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008). Once a driver has "everything he need[s] to proceed on his

5

way" the encounter with a law enforcement officer becomes consensual absent circumstances indicative of a seizure, such as the presence of several police officers, the display of a weapon by the law enforcement officer, physical touching of the person, or "use of language or a tone of voice indicating that compliance with the officer's request might be compelled." United States v. Galvan-Muro, 141 F.3d 904, 906 (8th Cir. 1998). But the encounter is considered consensual if "a reasonable person would feel free 'to disregard the police and go about his business.'" United States v. Flores, 474 F.3d 1100, 1103 (8th Cir. 2007)(internal citations omitted).

Wintle asked McKee back to his patrol car and seated him, unrestrained, in the front of the vehicle. The video of the stop reveals that Wintle processed the license and registration in a timely manner and maintained a calm and conversational tone with McKee. Upon returning all of McKee's paper work, Wintle asked McKee if he would mind answering a few more questions. Again, Wintle did not use a tone indicating McKee's presence or response to further questioning was compelled. In short, the continued interaction was consensual and thus was not an impermissible detention as McKee suggests.[1]

C. The forfeiture.

The United States alleges that the Currency is subject to forfeiture under 21 U.S.C. § 881(a)(6), which states:

> The following property shall be subject to forfeiture to the United States and no property right shall exist in them: . . . (6) All moneys, . . . furnished

---

[1] Although not briefed, McKee's Answer also questions whether he voluntarily gave permission for the canine sniff and whether Kubo indicated to the presence of drug odor. To the extent those matters were not briefed, McKee has abandoned these arguments. However, even if not abandoned, the court finds McKee consented to the canine sniff and during that sniff, Kubo indicated to the odor of drugs. McKee's assertions to the contrary are overruled.

6

or intended to be furnished by any person in exchange for a controlled substance . . ., all proceeds traceable to such an exchange, and all moneys, . . . used or intended to be used to facilitate any violation of [the Drug Abuse Prevention and Control Act].

21 U.S.C. § 881(a)(6). In a forfeiture action, the government has the burden of establishing by a preponderance of the evidence that the seized property is substantially connected to drug trafficking. 18 U.S.C. § 983(c)(1) & (3). Circumstantial evidence can establish that burden of proof. United States v. $84,615 in U.S. Currency, 379 F.3d 496, 501 (8th Cir. 2004). The government does not necessarily have to show a connection between the seized property and a specific drug transaction. United States v. $150,660.00 in U.S. Currency, 980 F.2d 1200, 1205 (8th Cir. 1992).

The Eighth Circuit has "adopted the common-sense view that bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking." United States v. 124,7000 in U.S. Currency, 458 F.3d 822, 826 (2006) (internal citations omitted). Wrapping money in rubber bands, being dishonesty about the existence of the currency, providing an untruthful story about the source of the money, and traveling with large amounts of currency on a known drug distribution route have each been recognized as circumstances indicative of an illegal drug trade. See, e.g., United States v. $117,920.00 in U.S. Currency, 413 F.3d 826 (8th Cir. 2005) (seized money found hidden beneath clothing, wrapped in a plastic sack, and in a piece of luggage and evidence of concealment by the claimant); United States v. $12,390.00 in U.S. Currency, 956 F.2d 801 (8th Cir. 1992) (noting that currency wrapped in rubber bands was characteristic of the way drug money is stored).

During the search of the vehicle being driven by McKee, officers discovered four bundles of rubber-banded currency concealed in a white bag, wrapped in a pair of sweat pants, and located in McKee's suitcase. Although not dispositive, the presence of large

7

amounts of concealed, rubber-banded currency is highly suspect and is indicative of drug trafficking.[2]

McKee falsely denied having more than $10,000 in the car, and represented to Wintle that he could not afford a citation fine because he was essentially broke – an obvious falsity. U.S. v. $124,700 in U.S. Currency, 458 F.3d 822, 826 (8th Cir. 2006) (lying when questioned by an officer calls into "question the legitimacy of the currency's presence")(citing $117,920 in U.S. Currency, 413 F.3d at 829). A canine indicated to odor of illegal drugs at the trunk of the car, and then independently to the money itself, which also supports a connection between the Currency and the drug trade. See United States v. $84,615 in U.S. Currency, 379 F.3d 496, 502 (8th Cir. 2004). McKee testified that the clothes in the trunk smelled of skunk spray from a barbeque McKee attended, and not raw marijuana. This explanation for the odor and the drug dog's indication was not credible.

McKee was driving a vehicle owned by another person, who was not traveling with McKee – another "suspicious circumstance" linking currency to drug trafficking. See $124,700 in U.S. Currency, 458 F.3d at 826. Further, McKee was traveling in an Oregon-plated vehicle with an Indiana temporary registration in the vehicle. His "friend," who owned the vehicle allegedly rode with McKee to Ohio, spent time in Indiana, and then flew back to Oregon while allowing McKee to drive his friend's car back Oregon several days later. While far from conclusive, the bizarre nature of these travel arrangements certainly raises suspicions.

---

[2] McKee argues that the amount of money in this case is substantially less than in cases relied upon by the government. However, $38,000 unquestionably qualifies as a "large" amount of bundled cash for the purposes of forfeiture cases. See United States v. $12,390 in U.S. Currency, 956 F.2d 801 (8th Cir. 1992); United States v. $34,600 in U.S. Currency, case no. 8:06cv567, 2007 WL 3244081 (D. Neb. Nov. 1, 2007).

8

McKee's explanation for his travel half-way across the country with $38,000 in rubber-banded cash is riddled with inconsistencies. McKee testified that he was driving to Ohio to solicit money from a college friend to buy a "fish store." McKee claimed he brought cash because the stack of cash would, in and of itself, have an "impact." McKee claims he wanted to do something "dramatic" to show he was "serious" about the business, and withdrew the money from his checking account at Key Bank – a bank he selected because it had both Ohio and Oregon locations. But during the traffic stop, McKee stated he did temporary construction work and was preparing to become a math professor. He never mentioned buying a fish shop. McKee testified that he presented his college friend with a business plan complete with a financial analysis. But he did not present the plan, or a copy of the plan, to the court during the trial. And if the true purpose of the $38,000 of cash was to solicit a business investor from Ohio, why did McKee withdraw the cash in Oregon instead of waiting until he arrived in Ohio and withdrawing it from a Key Bank location in that state? Finally, the bundles of bills were rubber-banded, and not sorted by denomination and wrapped as typically seen with a bank withdrawal. See United States v. $242,484.00 in U.S. Currency, 389 F.3d 1149, 1161-62 (11th Cir. 2004) (en banc) (noting that even if a legitimate business reason existed for transporting large amounts of cash, the cash would be expected to be in uniform bundles with bank wrappers and not stacks of intermixed denominations in rubber bands).

McKee claims the money itself was derived from legitimate sources. He allegedly received $5,600 for a motorcycle he bought and sold in the same day, received $17,500 in non-employee compensation from Green Energy Systems, Inc. – a company for which he served as an independent contractor allegedly supervising Green Energy Systems' employees, and the remaining proceeds were liquidated from a T.D. Ameritrade account. Even if the court accepts this explanation regarding the original source of the funds, the

court finds the defendant had used or intended to use the funds to carry out illegal drug activities.

Under the totality of the evidence of record, the court finds the government has met its burden of showing the Currency is substantially connected to drug trafficking. The money must be forfeited to the government.

Accordingly,

IT IS ORDERED,

1. The claim of Richard A. McKee, (Filing No. 9), is denied.

2. Judgment will be entered in accordance with this memorandum and order.

Dated this 29nd day of May, 2013.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.